UNITED STATES, Appellee,

v.

Specialist Four Jeffery M. MACKEY, SSN 296–46–1337, United States Army, Appellant.

CM 437055.

U. S. Army Court of Military Review.

25 April 1979.

Mitchell Willoughby, Esquire, Captain Larry Fuchs, JAGC, and Captain Kevin E. O'Brien, JAGC, were on the pleadings for appellant.

Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, Major Robert B. Williams, JAGC, and Captain Dennis S. Cameron, JAGC, were on the pleadings for appellee.

Before JONES, DeFORD and LEWIS, Appellate Military Judges.

## OPINION OF THE COURT

DeFORD, Judge:

The appellant, contrary to his pleas, was convicted of possession and sale of marijuana on two separate occasions in violation of Article 134, Uniform Code of Military Justice (UCMJ) (10 U.S.C. § 934). He received a bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for one year, and reduction to the grade of Private (E1).

On appeal, appellant through counsel alleges four assignments of error which he believes justify reversal of his conviction. The Court has carefully examined these assignments and finds that none are meritorious. However, we will discuss two of the assignments in the hope that our opinion will add further clarity to the law with regard to these propositions.

The factual circumstances under which these offenses occurred are as follows: the appellant was assigned to the Welcome and Departure Center as a clerk at Fort Jackson, South Carolina in the early months of 1977. During this time the appellant's name was given to the CID Drug Suppression team by an informant as a seller of marijuana. Special Agent Quattlebaum assigned an undercover military policeman named Piaz to attempt to purchase marijuana from the appellant. Piaz was introduced to the appellant through the informant, a soldier named Tomeldin.[1]

Tomeldin and Piaz met the appellant at the Welcome and Departure Center on the early afternoon of 15 June 1977. The appellant showed the two men 4 bags which allegedly contained marijuana which Tomeldin examined and advised Piaz that the

---

1. Tomeldin could not be located and did not testify at trial.

offered illicit substances were "all right." Piaz paid the appellant $20.00 for the four packets (Prosecution Exhibits 1–4). Piaz also asked the appellant if he could acquire a pound of marijuana. The appellant replied that he could and advised Piaz to call him the next day.

The four packets of marijuana were then turned over to Special Agent Quattlebaum. Piaz also administered a field chemical test of at least a portion of the packets purchased which indicated the substance tested was marijuana. These substances were subsequently turned over on a property receipt to the CID Evidence Custodian.

The appellant testified at trial that he introduced Tomeldin and Piaz to an acquaintance named "Art" who sold the illicit substances to Piaz at the Welcome Center. Appellant testified that he had nothing to do with the transfer of illegal substances other than introduce the parties. A Specialist Hall, one of the appellant's friends and a fellow worker at the Welcome Center corroborated most of the appellant's testimony. He stated he saw Art pass a packet to Piaz and receive money.

On 16 June 1977 pursuant to their conversation the previous day, Piaz telephoned the appellant at the Welcome Center and inquired concerning the possibility of a second purchase of marijuana. The appellant stated he had some "ounces" to sell and arrangements were made for the parties to meet at the Welcome Center. Piaz went to the Welcome Center at 1500 hours and found the appellant in uniform working at his assigned job. Piaz testified that appellant left his job, borrowed a car and drove Piaz off post to the Palms Apartments where the parties entered an apartment and found a woman subsequently identified as Barbara Ross present. Piaz further stated that the appellant went to one of the bedrooms and returned a few moments later with numerous bags of marijuana and advised Piaz to take his pick of the offered substances. Piaz selected two plastic bags and paid the appellant $40.00. The appellant then drove Piaz back to the post. Piaz then turned over the two bags to Special

Agent Quattlebaum, again field testing a portion of the substances and receiving a positive result from the test. These substances, along with those purchased the previous day, were catalogued, marked, property accountability was maintained and the substances were transferred to the CID property custodian who forwarded the substances by registered mail to the CID laboratory where the substances were tested and the presence of marijuana was confirmed. The laboratory returned to the Evidence Custodian the substances and the packaging in which the substances had been received in a hermetically sealed plastic bag.

The appellant testified that when Piaz called him on the telephone he informed him that Art would be in the appellant's apartment that afternoon visiting Barbara Ross and that if Piaz needed a ride, the appellant would provide transportation. He further stated that when Piaz came to the Welcome Center, he received permission to leave his job for a few minutes and borrowed a car and drove Piaz to his apartment. Upon arrival at the apartment, Ross and "Art" were sitting at the kitchen table and he went into the bedroom. He did not see an illicit substance transaction take place. Barbara Ross testified that Piaz and "Art" conducted a transaction that afternoon and that appellant did not participate in that transaction.

Agent Springer interrogated the appellant on 29 June 1977. After appropriate warnings and waiver of his constitutional and statutory rights, the appellant, although denying any participation in the two enumerated illicit substances transactions, admitted he had told Piaz that he would obtain a pound of marijuana and sell it to him. He further admitted that on occasion he had introduced friends to persons who would sell illicit substances.

I

Appellant contends before us, as he did before the trial court, that the court-martial lacked jurisdiction over the offenses committed on 16 June 1977 (specifications 3 and

4) as they were not "service connected" within the meaning of that term as applied in the decision of *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

Appellant further contends that none of the twelve standards enunciated in *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), substantiate military jurisdiction and, essentially, that the offenses involved in specifications 3 and 4 were a consequence of two people riding off-post together and then entering into an agreement, allegedly whereby one purchased drugs from the other. They state that the parties then returned to post with each going his separate way.

The decision in *O'Callahan v. Parker, supra,* established that court-martial jurisdiction could not be extended over general civil crimes committed by soldiers off the military reservation in the United States unless those offenses have a substantial impact upon the discipline of the Armed Forces.

In *Relford, supra,* criteria were enunciated which, when applied on an ad hoc basis, assist in determining whether the crime in question possesses those characteristics of service connection.

The issue of "service connection" turns in a major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in the civilian courts.[2]

The Supreme Court of the United States in *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), took note of the Solicitor General's statement that " 'drug abuse is a far more serious problem in the military context than in civilian life'." [3] That Court then noted the comments in *United States v. Beeker,*[4] that the use of marijuana and narcotics by military persons on or off a military base has special military significance in light of the disastrous effects of these substances on the health, morale and fitness for duty of persons in the armed forces.

Examining the factual circumstances of this case in light of the *Relford* criteria we observe (1) the appellant was not properly away from the installation at the time of negotiation and sale of the prohibited substances. We note in this regard that the initial negotiation involving specifications 3 and 4 occurred on the afternoon of 15 June 1977 at the Welcome Center on Fort Jackson. Agent Piaz's telephone call to the appellant on the afternoon of 16 June established that appellant possessed some "nickel bags" of marijuana for sale. Piaz contacted the appellant at the Welcome Center in order to complete the sale. Appellant who was working at his assigned job received permission from his supervisor to leave his job for a short time to "take care of business." We have no doubt that had appellant's supervisor been told the true nature of the "business" intended his permission to be absent would not have been given. Accordingly, we view the appellant's absence from the installation as essentially an illegal absence. (2) The actual transfer of marijuana and money took place off the installation at the Palm Apartments. However, we believe the price of the substances to be sold was established on the post; (3) the Palm Apartments were located in an area subject to civil law enforcement; (4) the offenses occurred within territorial confines of the continental United States; (5) the offenses took place during a time of peace and had no relationship

---

2. *Schlesinger* v. *Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

3. *Id.* 420 U.S. 759, at n. 34, 95 S.Ct. at 1314 n.34.

4. *United States* v. *Beeker,* 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969). This decision has been sapped of much of its vitality by a subsequent decision of the United States Court of Military Appeals. *See United States* v. *McCarthy,* 2 M.J. 26, 29 (C.M.A.1976). However, the statements made therein concerning the serious problem of drug abuse in the armed forces appears to be as valid now as when enunciated in 1969.

to the war making power; (6) the crimes in question were related to the appellant's military duties. It is apparent that appellant used his position as a clerk in the Welcome and Departure Center to further his illegal activities and conduct illegal business arrangements; (7) the victim of the offenses was an undercover military policeman. It is also apparent under the facts of this case that the appellant knew he was selling marijuana to soldiers. Although Piaz was wearing civilian clothing at the time he was introduced to the appellant, the introduction was conducted by a soldier named Tomeldin who was known to the appellant as a soldier on the installation. This observation is further confirmed by the fact that after completion of the sale appellant returned Piaz to the installation after the purchase had been completed. He obviously believed that Piaz belonged on the installation and that the contraband he had sold would end up being used or distributed on the installation.[5] (8) The crimes committed here are of that type that are normally processed in the civil courts, and there is no indication that those courts were unavailable to try these offenses; (9) the crimes here were not unrelated to military authority and the enumerated acts constitute a flouting thereof; (10) the offenses committed presented an immediate threat to the military installation; (11) the offenses did not involve military property; and finally (12) the offenses were among those traditionally prosecuted in the civilian courts and were not peculiarly military in nature.

As may be seen five of the enumerated criteria support military jurisdiction. We find, as did the military trial judge, that the appellant's activities constituted an illegal act among soldiers that manifested a severe threat to the military installation. Accordingly, we hold that the military had a paramount interest in this prosecution which was distinct from and greater than the civilian community in which it partially occurred.

## II

Appellant further contends that the trial judge committed error in admitting into evidence the marijuana sold by the appellant to Piaz on both 15 and 16 June 1977 and the laboratory report confirming the presence of the illegal substances.

The thrust of appellant's position is grounded upon the language employed in the decision of *United States v. Nault,* 4 M.J. 318 (C.M.A.1978), wherein it was stated:

> The in-court identification of pills and other fungible items by a competent witness is generally not permitted where the item is neither readily identifiable, marked distinctively, nor possessed of individuated characteristics. Certainly the attempt in this case to establish the identity

---

**5.** We note, as was done in *United States v. Alef,* 3 M.J. 414, 418, n.12 (C.M.A.1977), that the sale of illicit substances to an undercover policeman will result in those substances being removed from distribution and consequently result in no threat to the military post. However, we observed in *United States v. Valles-Santana,* 2 M.J. 1049 (A.C.M.R.1976), n.10, *aff'd* 4 M.J. 84 (C.M.A.1977), the fact that a seller sells to an undercover police officer and thus unknowingly avoids the distribution which the seller believes he was creating should not diminish the consequences of his illegal act. We believe that if the seller transfers the illicit substances under circumstances that objectively manifest that his act of sale could result in a distribution pattern in which it is reasonably foreseeable that that distribution will adversely affect the health, morale, and fitness of other soldiers, the threat to the security of the military post is then apparent. Thus the inquiry rests upon whether there was a manifested threat rather than an actual one. We do not believe that the Supreme Court of the United States intended that soldiers should be given civilian sanctuaries to practice prohibited acts which, by their nature seek to corrupt and pervert military personnel on the military enclave. The Constitution authorizes the Congress to make rules for Government and regulation of the land and naval forces. Congress enacted the Uniform Code of Military Justice for that purpose. The Supreme Court of the United States has noted that the power to regulate includes the power to try and punish. The military commander cannot preserve the integrity of his command if he cannot control his own personnel who engage in such corrupt practices as selling marijuana to other soldiers within the immediate proximity of his installation and which are targeted against that installation.

of the pill by positive witness identification was ineffective. Generally fungible evidence becomes admissible and material through a showing of continuous custody which preserves the evidence in an unaltered state. (4 M.J. at 319).

Counsel further points to the fact the record does not contain any evidence establishing custody of the seized substances from 20 June to 28 June 1978.

As noted in the factual recitation above a portion of the marijuana sold by the appellant to Piaz was, in each instance, field tested by Piaz in the presence of Special Agent Quattlebaum. The results of those tests indicated the substance tested was marijuana.

The four envelopes of marijuana received on 15 June and the two packages of marijuana purchased on 16 June were placed inside plastic bags, dated, initialed, and sealed. Agent Quattlebaum prepared a request for laboratory examination and the evidence was given to the CID Evidence Custodian Springer on a property receipt. Springer forwarded the evidence by registered mail to the Army laboratory at Fort Gordon, Georgia. The laboratory report and the accompanying property receipt forms indicate that the evidence was received by the laboratory, tested and their report confirms that the substances were marijuana. The laboratory placed the evidence and their original containers in hermetically sealed plastic bags and returned them by registered mail to the Evidence Custodian Springer. The period 20 June 1977 to 28 June 1977 represents the time that the evidence was placed in the mails to the laboratory, received there, tested, and returned through the mails. No oral testimony was offered at trial to cover this time period or action taken by the laboratory personnel.

The appellant's objection at trial extended only to the six exhibits of marijuana and the lab report. The property receipts indicating the chain of custody were admitted without objection.

The thrust of the appellant's argument is that he was denied his sixth amendment right of confrontation with the chemist and that the Government failed to show that the substances seized from the appellant were those examined and returned by the laboratory.

■ It has been established that an accused has the right to challenge the accuracy of laboratory chemist reports by summoning the analyst and attacking the regularity of the testing procedures and the competency of the analyst. However, in the absence of such a request, laboratory analysis of materials forwarded to the CID laboratory and the reports issued thereon are actions taken in the normal course of business of that organization and as such the admissibility of the laboratory report is within the business exception to the hearsay rule.[6]

■ Here, the appellant and his counsel did not make a formal request for the presence of the chemical analyst. In court the trial judge offered the appellant the opportunity to make such a request which the appellant declined to do. His act waived his right to require the analyst to appear.[7] Appellant continued his objection on the basis of an incomplete chain of custody and an absence of any showing that the laboratory analyzed the same substances received from the appellant.

Here, as we have noted, the prosecution placed before the court the oral testimony of Piaz, Quattlebaum, and Springer. These were the only people who had allegedly received the marijuana from the time it was received from the appellant until the substances were forwarded through the mail to the laboratory. Their testimony, if believed, established the relevancy and materiality of the laboratory report and the fact that the material was forwarded to the laboratory in their original containers which were sealed into plastic bags. The original containers were dated and initialed.

6. *United States v. Evans,* 21 U.S.C.M.A. 579, 45 C.M.R. 353 (1972).

7. *Id.*

Springer further established that he received the marijuana from the lab in hermetically sealed plastic bags which also contained the original marked containers. He further stated there was no indication of tampering.

 The question of the admission of Prosecution Exhibits 1–6 and the lab report rested within the sound discretion of the military judge. He had before him sufficient evidence which could satisfy him that a reasonable probability existed that the marijuana had not been changed in any important respect.[8] In addition, he could be reasonably assured that the postal and laboratory personnel properly performed their respective functions with regard to the evidence in question.[9] Accordingly we do not believe the military judge abused his discretion in admitting the six marijuana exhibits or the laboratory report thereon.[10]

There is a further basis to sustain the admission of the marijuana exhibits. As noted, the agents field tested a portion of the marijuana prior to its being forwarded to the CID Evidence Custodian. Their field test was positive for marijuana and Piaz testified as to his background and experience as a policeman which he used in identifying this marijuana. He further testified as to his familiarity with the field test procedure. His testimony, if believed, could be considered competent evidence of the identity of the substances.[11] Accordingly, we find no error.

The remaining assignments of error have been considered and are deemed to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge JONES and Judge LEWIS, concur.

---

8. *United States v. Martinez,* 43 C.M.R. 434 (A.C.M.R.1970) (en banc). *cf. Gallego v. United States,* 276 F.2d 914 (9th Cir. 1969), and *United States v. Brown,* 482 F.2d 1226 (8th Cir. 1973).

9. *United States v. Grimm,* 6 M.J. 890 (A.C.M.R. 1979).

10. We do not believe that *United States v. Nault, supra,* changed the law with regard to the rule set forth in *Martinez, supra.* In that case the fungible item, a pill was substantially used in the laboratory testing and the few crystals that remained were not identifiable. That case is clearly distinguishable from the case at bar as the original container here showed the original marking made by the agents at the time they received the evidence and that evidence was positively identified in court as having been received from the appellant.

11. *United States v. Watkins,* 5 M.J. 612 (A.C.M.R.1978).